**This document was signed electronically on October 14, 2016, which may be different from its entry on the record.**

**IT IS SO ORDERED.**

**Dated: October 14, 2016**




**ALAN M. KOSCHIK**
**U.S. Bankruptcy Judge**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re | ) | |
| | ) | Case No. 14-50685 |
| ANTHONY F. MAGLIONE, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | Chapter 7 |
| -------------------------------------------- | ) | |
| | ) | |
| HAROLD A. CORZIN, TRUSTEE, | ) | Adversary Proceeding No. 14-05110 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| RUTH B. DIGIAMMARINO, | ) | Judge Alan M. Koschik |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**MEMORANDUM DECISION FOLLOWING TRIAL**
**ON PLAINTIFF'S ACTIONS FOR AVOIDANCE OF FRAUDULENT TRANSFER**
**AND STATE-LAW PREFERENCE**

## INTRODUCTION

Now before the Court are the claims asserted by Plaintiff Harold A. Corzin, the duly-appointed Chapter 7 Trustee (the "Plaintiff" or "Trustee") of the bankruptcy estate of debtor Anthony F. Maglione (the "Debtor") in this adversary proceeding against Defendant Ruth B. DiGiammarino (the "Defendant"), the mother of the Debtor.

## JURISDICTION AND VENUE

This Court has jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334 and General Order No. 2012-7 entered by the United States District Court for the Northern District of Ohio on April 4, 2012. This is a core matter pursuant to 28 U.S.C. § 157(b)(2)(F) and (H). Venue is proper pursuant to 28 U.S.C. § 1409(a).

## PROCEDURAL HISTORY

On October 25, 2014, the Plaintiff Trustee filed his complaint in this adversary proceeding seeking avoidance of the Debtor's transfer of $30,000 cash -- literally cash, as in physical currency -- to Debtor's mother, the Defendant herein. After the Defendant's answer and an opportunity for discovery, the parties filed their Stipulations of Fact on April 24, 2015 (Docket No. 19) (the "Stipulations"). Although the Stipulations include only a signature block for Defendant's counsel and no actual signature, the Defendant's counsel confirmed at trial that the Stipulations were, in fact, agreed to by both parties. The Court conducted a trial on May 4, 2015. The Court received the testimony of the Debtor, the Defendant, and the Debtor's ex-wife, Louise M. Maglione. The Court took the Plaintiff's claims and the Defendant's asserted defenses under advisement.

## FINDINGS OF FACT

Prior to May 2000, the Debtor and his now ex-wife, Louise M. Maglione ("Louise"), incurred debts on certain credit cards that were in the name of both Frank DiGiammarino, the Debtor's father, and the Debtor's mother, the Defendant here. Those accounts were with a variety of creditors, including Key Bank, JPMorgan Chase, and Montgomery Ward. As of May 2000, the amount of these debts totaled $22,724.43. Based on the trial testimony of Louise, these debts were incurred without the consent of the Debtor's parents, and that when the Debtor's father learned of these charges, he was "very upset."

In mid-April 2000, the Defendant and her husband borrowed funds from National City Bank, mortgaging their residence at 4740 Bali Drive, Akron, Ohio, and used a portion of the loan proceeds to satisfy the balances on the credit cards that had been used by the Debtor and Louise. The parties stipulate that at this point, the parents and the Debtor, along with his ex-wife, Louise, agreed that the Debtor and Louise would repay the parents $22,724.43 in monthly installments. This agreement was not reduced to writing. No promissory note was prepared, executed, or delivered. The parties stipulate that the loan was to bear no interest.

The following month, on May 19, 2000, the Debtor and his wife, Louise, filed a joint, voluntary petition for relief under Chapter 13 of the United States Bankruptcy Code. This filing was made with the full knowledge of the Defendant. The Debtor's petition in the Chapter 13 case, Case No. 00-51482, which was also filed in the Northern District of Ohio at Akron, did not schedule the alleged debt to the Defendant or her husband.

Notwithstanding the fact that the Debtor and his wife were then Chapter 13 debtors who were obligated to make plan payments to the Chapter 13 trustee on account of their creditors in an amount that exhausted their disposable income above and beyond their reasonable expenses,

the Debtor and Louise nevertheless either began to make or continued to make monthly installment payments to the Defendant and her husband on account of the oral agreement to repay the original credit card debt. It is unclear to the Court whether the Chapter 13 Trustee was aware of these payments or the income or assets used to make them. The parties have stipulated to exhibits that include a series of handwritten receipts for each such monthly payment. While the installment payments were documented, the legal obligation to repay was not.

The Defendant, and perhaps the Debtor, were relatively fastidious with respect to keeping records of the monthly installment payments. The Debtor and Louise initially paid, over the course of eleven months, $600 per month. As a result of a refinancing of their mortgage on April 28, 2001, the Debtor and her husband paid off National City Bank and replaced it with a mortgage loan from Bank One at a lower rate with lower payments. The Debtor and Louise continued to make payments thereafter for the following twelve months at a reduced rate of $500 per month. On June 28, 2002, the Defendant and her husband again refinanced their mortgage debt. This time they refinanced with the same lender, Bank One. Following this refinance, the Debtor and Louise reduced their payments to his parents to $466 per month and those payments were made for an additional eight months from August 6, 2002 until March 12, 2003. The evidence and stipulations suggest that the repayment terms between the Debtor and the Defendant and their respective spouses were designed to cover the payments the parents were obligated to make to their mortgage lender. Because the parties had agreed that the Debtor would repay the credit card expenditures without interest, it appears that each payment simply was intended to be applied to principal.

During a couple of months in the Spring of 2003, several events happened in rapid succession. First, the Debtor and Louise were granted a discharge under Chapter 13 of the

United States Bankruptcy Code on April 16, 2003. This was one month following the last payment they made to the Defendant and her husband on account of the original credit card charges. Two months later, in June 2003, the Debtor became disabled and could no longer work, presumably limiting the Debtor's income and ability to make payments. The payments that were made over the course of approximately three years by the Debtor to the Defendant and her husband totaled $16,864. Simply using arithmetic, this would leave a mathematical balance due of $5,860.43. This mathematical result, however, ignores the facts that the debt, to the extent that it was ever an enforceable debt rather than an unenforceable promise, predated the Debtor and Louise's Chapter 13 filing in May 2000, that the Defendant was aware of the filing, and that the Debtor and Louise obtained a discharge of all of their prepetition debts on April 16, 2003.

Shortly after the Debtor became disabled, on July 14, 2003, he transferred title to his 1973 Dodge Charger to the Defendant in exchange for no consideration. The Defendant testified at trial that this was the Debtor's car ever since he was first married. While the title transferred to the Defendant, the testimony at trial makes clear that at all times the Debtor retained possession of the 1973 Dodge Charger. Just as the Debtor's supposed debt obligation to his parents was never scheduled in his Chapter 13 bankruptcy petition, neither was the 1973 Dodge Charger scheduled as an asset of that estate.

The factual record then skips forward approximately eight years. Based on the testimony at trial and the Stipulations of Fact, the Debtor made no further payments to the Defendant after March 2003.

While the evidence is not clear as to whether it was related to the disability that prevented the Debtor from working after June 2003, the record is clear that the Debtor is a Vietnam Veteran who suffered injuries related to exposure to Agent Orange while serving in Vietnam.

These injuries resulted in a retroactive award of benefits from the United States Government in the amount of $120,000 on or about July 8, 2011. Trial testimony attests that this benefit was tax free. In addition, beginning in August 2011, the Debtor began receiving certain additional veteran's benefits prospectively on account of his injuries, as well as social security disability benefits. These payments, along with his pension benefits from his former employer, providing the Debtor with monthly income of approximately $5,400.

The parties do not agree on how the Debtor used much of this money. The Debtor testifies that he paid off a variety of bills and debts following his receipt of the Agent Orange settlement. He also testified that he bought himself a new pick-up truck and that he purchased a used car for Louise. Both he and Louise testified at trial that Louise handled the checkbook and paid many of the bills and for that reason he did not recall the specifics about what creditors may have been paid. It does appear from the records presented to the Court and admitted into evidence that a variety of creditors with claims that existed at or about this time were not paid off and remained due and outstanding and in fact resulted in proofs of claim filed in this bankruptcy case filed in 2014.

What is clear by stipulation is that on November 16, 2011, the Debtor withdrew $77,000 in cash from an account in his name only at PNC Bank. In fact, this same $77,000 was deposited into that PNC account only several days prior to that withdrawal, an amount that had been transferred from another account that he owned jointly with his ex-wife, Louise. After the November 16, 2011 withdraw, however, the cash was never again deposited into any bank account of the Debtor. This withdraw of an extraordinary amount into cash had the effect of making tracing of the funds following that date very difficult, if not possible.

The story told at trial picks up approximately ten months later. In June of 2012, the Defendant entered into a contract for the purchase of a residence located at 2299 14th Street, SW, Akron, Ohio. The Defendant closed on that sale on or about August 6, 2012, in a transaction that involved payment of approximately $11,500 in cash and a mortgage loan of approximately $41,600 extended by JPMorgan Chase. The source of the $11,500 down payment is unclear, the Defendant having testified inconsistently at trial both that it was from her checking account and that it was from a withdraw from an IRA account; based on the timeline of events and other testimony at trial, some of the funds may have come from the life insurance proceeds from her husband's death. Mr. DiGiammarino passed away on or about April 15, 2012.

The Debtor immediately moved into the 2299 14th Street. This move was a result of his separation from Louise. While the Defendant continues to own the 14th Street property, the Debtor continues to occupy it. The Debtor has paid $750 per month to the Defendant as rent for his occupancy of the 14th Street property.

The purchase of the 14th Street residence and the Debtor's separation from Louise were not the only events that happened in this narrow timeframe. On September 1, 2012, the Debtor transferred the sum of $30,000 in cash, actual currency, to the Defendant (the "Transfer"). The Defendant provided the Debtor with one of her small, handwritten receipts, which receipt appears in the exhibits introduced into evidence at trial. The Defendant did not deposit those funds into any bank account. Her use of the funds is unclear.

In addition, on September 13, 2012, only twelve days after the $30,000 Transfer to the Defendant, the Defendant created the Revocable Living Trust of Ruth B. DiGiammarino (the "Trust"). At the same time, the Defendant executed a Last Will and Testament that included a pour-over provision into the Trust. This Trust followed the termination of an earlier family trust

dating from 2001 that had been settled by the Defendant along with her then-living husband. Among the various assets that were transferred into the new trust were the 14th Street residence and the 1973 Dodge Charger. The Trust agreement provided that the Debtor was, as one of the beneficiaries, entitled to the house and the car upon the death of the Defendant.

At the time of the Transfer, the Debtor owed $160,020.13 to Bank of America as a mortgage on his marital residence that he owned with Louise. That debt was secured by the marital residence, which was located at 6683 Manchester Road, Clinton, Ohio, which had an auditor's value of approximately $94,580. Therefore, at the time of the Transfer, this loan was only partially secured and included an unsecured claim of approximately $65,000. Also, the Debtor owed as of September 2012, debts to Sam's Club, Sears, Lowe's, Discover Bank, Webbank, Eagle Acceptance Corp, and Comenity Bank, all of whom have filed proofs of claim in the Debtor's Chapter 7 case. The Internal Revenue Service also asserts claims in this case against the Debtor, claims that existed in September 2012.

The flurry of events coalescing in the late-summer, early-fall of 2012 included the Debtor's commencement of a divorce proceeding against Louise on September 26, 2012. The Debtor had been married to Louise for 38 years and there was significant disparity in incomes between the Debtor and his wife, which clearly would result and, in fact did result, in a spousal support award. On February 26, 2013, an Order was entered by the Summit County Court of Common Pleas, Domestic Relations Division directing the Debtor to pay Louise the sum of $2,500 per month.

The testimony given at trial, including cross-examination, makes clear that the Defendant, as the mother of the Debtor, was aware of the Debtor's financial condition, the fact that he had outstanding debts including easily anticipated support obligations to Louise resulting

from their separation and impending divorce, and the inevitable foreclosure of their marital residence.

The Debtor filed his voluntary petition seeking relief under Chapter 7 of the United States Bankruptcy Code in this case on March 19, 2014. The Plaintiff was appointed the Trustee for the Debtor's estate. The commencement of this case was less than two years following the date of the Transfer of $30,000 cash to the Defendant.

## LEGAL ANALYSIS

### A. The Transfer to the Defendant Is Avoidable Under 11 U.S.C. § 548(a)(1)(A) Because It Was Made with the Actual Intent To Hinder, Delay, or Defraud Creditors of the Debtor.

#### 1. Actual Intent to Hinder and Defraud Creditors is Generally Proven by Objective Circumstantial Evidence – "Badges of Fraud."

Fraudulent intent is rarely proven by direct evidence. Instead, it can be proved through objective indicia of fraud or "badges of fraud." *Silagy v. Gagnon (In re Gabor)*, 280 B.R. 149, 157 (Bankr N.D. Ohio 2002) (Kendig, J.) (citation omitted). The presence of one or more badges of fraud gives rise to a presumption of fraud and consequently shifts the burden of disproving fraud to the defendant. *Holcomb Health Care Servs., LLC v. Quart Ltd. (In re Holcomb Health Care Servs.)*, 329 B.R. 622, 671 (Bankr. M.D. Tenn. 2004) (citation omitted). Although the presence of a single badge may only raise the suspicion of debtor's fraudulent intent, the confluence of several badges can be conclusive evidence of fraudulent intent, absent significantly clear evidence of the debtor's legitimate supervening purpose. *Gabor* at 157. "Badges have fraud" have been described generally as "any facts that throw suspicion on the transaction and call for an explanation." *Holcomb Health Care* at 670 (citation omitted). "Badges of fraud are circumstances so frequently attending fraudulent transfers that an inference

of fraud arises from them." *Schilling v. Heavrin (In re Triple S Rests., Inc.)*, 422 F.3d 405, 414 (6th Cir. 2005). Therefore, all lists of specific badges of fraudulent intent are necessarily illustrative, not exhaustive. The *Holcomb Health Care* court itemized a list of nine specific circumstances that courts in Tennessee have considered badges of fraud. *Id.* In Ohio, bankruptcy courts have appropriately appropriated the list from the Ohio Uniform Fraudulent Transfer Act (UFTA), R.C. 1336.01 *et seq.* This list of badges of fraud includes:

> (1) Whether the transfer or obligation was to an insider;
>
> (2) Whether the debtor retained possession or control of the property transferred after the transfer;
>
> (3) Whether the transfer or obligation was disclosed or concealed;
>
> (4) Whether before the transfer was made or the obligation incurred, the debtor had been sued or threatened with suit;
>
> (5) Whether the transfer was of substantially all of the assets of the debtor;
>
> (6) Whether the debtor absconded;
>
> (7) Whether the debtor removed or concealed assets;
>
> (8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the obligation incurred;
>
> (9) Whether the debtor was solvent or became insolvent shortly after the transfer was made or the obligation was incurred;
>
> (10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred; and
>
> (11) Whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor.

R.C. 1336.04(B); s*ee also Slone v. Lassiter (In re Grove-Merritt)*, 406 B.R. 778, 794 (Bankr. S.D. Ohio 2009) (incorporating list).

2. The Trustee Has Established Sufficient "Badges of Fraud" to Switch the Burden to the Defendant.

A sufficient number of badges of fraud have been shown here to give rise to the inference of fraudulent intent and shift the burden to the Defendant to rebut that inference.

First, the Defendant is Debtor's mother and therefore has a close family relationship.

Second, the Debtor and Defendant had a history of secret transactions, including the transfer of title in a car, without transferring possession, all while excluding it from the 2000 bankruptcy petition. More important to this case, the Debtor engaged in another secret, or at least secretive, transaction by withdrawing $77,000 in cash from a personal bank account in his name only, so as to cut off all tracing of those assets and hiding them from his soon-to-be ex-wife; no other more innocent purpose for a cash withdrawal of that size at that time was credibly offered to the Court at trial. Of the $77,000, $30,000 was transferred to the Defendant—a transaction that was also concealed and relatively difficult to trace other than by the Defendant's handwritten receipt and the testimony of the parties under oath.

The secrecy-shrouded transactions were part of a larger pattern of arranging for assets to economically benefit the Debtor while keeping them out of his name and difficult to trace to him. In addition to the car, the Defendant created a trust with the Debtor as a beneficiary and placed a newly-purchased home into that trust. While the house was purchased before the $30,000 Transfer and the Debtor did pay rent, that rent essentially amortized the mortgage on the house that was bought with a cash down payment by the Defendant only weeks before she received the Transfer from the Debtor. The house was held in trust for his benefit and would be left to him after his mother's death.

Third, the debt that supposedly was owed by the Debtor to the Defendant is inadequate or no consideration for the $30,000 transfer. First and foremost, even if it had ever been a legitimate debt, that debt had been discharged in the Debtor's Chapter 13 case from 2000. While the debt was not scheduled in that case, the Debtor's mother had actual knowledge of the case in time to have filed a proof of claim in that case, which is sufficient to find that that debt was discharged notwithstanding its unscheduled status. 11 U.S.C. § 523(a)(3)(A) (providing that unscheduled claims are still discharged if the "creditor had notice or actual knowledge of the case" in time to file a "timely proof of claim"). In addition, the existence of the debt was unproven; in addition to being unscheduled in both this bankruptcy and Debtor's earlier bankruptcy, no loan documents exist establishing the obligation. The periodic payments from years ago do offer some evidence that a debt of some kind existed, but those payments ceased years ago. Even under the most fair interpretation of the parties' trial testimony regarding that obligation, that debt had previously been paid down from $22,724.43 to approximately $6,000, and then largely ignored until the Debtor wished to shovel money out the door shortly in advance of divorce and bankruptcy.

Fourth, the dissipation of assets shortly before divorce likewise gives rise to an inference of fraud; the Court finds that this is legally analogous to the tenth badge of fraud itemized in the Ohio UFTA, transfers shortly before incurring a substantial debt.

Fifth, while the $30,000 specifically transferred to Defendant might not have been substantially all the assets of the Debtor, the $77,000 cash withdrawal, of which the $30,000 was part, was by far the largest part of the Debtor's assets, particularly his liquid assets. The marital residence was facing foreclosure and the Debtor had few other substantial assets.

Given the number and magnitude of the badges of fraud present in the Transfer, it is clear that the Trustee has carried his burden sufficiently to give rise to the inference of fraud, and it is the Defendant's burden to prove that the Debtor did not perform the Transfer with actual fraudulent intent.

3. The Defendant Has Failed To Establish That the Transfer Was Not With the Actual Intent to Hinder and Defraud the Debtor's Creditors, Including His Ex-Wife.

The Debtor's testimony was confusing, inconsistent, and unreliable; to a lesser extent, so was Defendant's. The Debtor was capable of going into substantial detail about a variety of mundane, generally unimportant transactions, but was unable to produce any clear evidence of the original debt and was evasive and ambiguous when pressed on the issue of the debt's existence, size, and enforceability at the time of the Transfer. The Debtor's testimony was intended to have the Court believe that he considered the debt a moral imperative even if it was not properly legally documented, but then offered no explanation for why the debt was not paid shortly after the receipt of the Agent Orange settlement. At that time, the Debtor and his then-wife apparently paid off several other debts. Meanwhile, his father, to whom the Debtor supposedly owed at least a moral obligation to repay for the unauthorized credit card charges, was still alive. That would have been the more obvious and appropriate time to satisfy legitimate debts to family and others. The failure to do so strongly suggests that no such outstanding debt was in existence and that no repayment to the Defendant was contemplated at the time of the Agent Orange settlement. Instead, this "debt" was left outstanding until it became apparent that the Debtor was divorcing his wife, needed to move out, and wanted to avoid a substantial property division, not to mention a continuing obligation to pay spousal support sufficient to maintain the marital residence, which he did not do even after a contempt judgment in state

court. The marital residence was on the brink of sheriff's sale as of the date of the trial, and it is plain enough that Debtor had no intention of paying any of the delinquent spousal support that might prevent it.

In addition, at the time of the Transfer, the Debtor had outstanding creditors who had not been paid, notwithstanding the testimony that many other creditors were paid with the proceeds of the Agent Orange settlement. The claims register in this case shows multiple creditors, including the IRS, with claims that date to 2011 and earlier.

Therefore, the Defendant and the Debtor have failed to establish any "legitimate supervening purpose" for the Transfer. *See Gabor*, 280 B.R. at 157. The Transfer, in addition to the Defendant's contemporaneous transactions involving the creation of her Trust and purchase of a house for the Debtor's use and ultimate inheritance via that Trust, are evidence of a scheme to protect the Debtor vis-à-vis his creditors, including his ex-wife, by transferring assets out of the Debtor's name on the eve of divorce and while other debts remained due.

**B. The Trustee Has Failed To Prove at Trial a Claim for Avoidance of a Constructive Fraudulent Transfer Pursuant to 11 U.S.C. § 548(a)(1)(B).**

1. Legal Framework for Constructive Fraudulent Transfers Under Section 548.

The Bankruptcy Code provides a second, separate basis for avoiding a transfer as fraudulent pursuant to 11 U.S.C. § 548. Section 548(a)(1)(B) allows a trustee to avoid a transfer as "constructively fraudulent"—constructive because the debtor's actual intent in making such transfer is immaterial:

> (a)(1) The trustee may avoid any transfer . . . of an interest of the debtor in property . . . that was made . . . on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily –
>
> . . . .

(B)(i) received less than reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. §548(a)(1)(B).

2. The Debtor's Transfer to the Defendant Was With Less Than Reasonably Equivalent Value.

"Typically, a dollar-for-dollar reduction in debt constitutes—as a matter of law—reasonably equivalent value for purposes of the fraudulent-transfer statutes." *Southeast Waffles, LLC v. U.S. Dept of Treasury/Internal Revenue Service (In re Southeast Waffles, LLC)*, 702 F.3d 850, 857 (6th Cir. 2012). However, as already described, there was no enforceable debt to be reduced by the transfer; no such debt was proven to have existed, and to any extent such debt existed and was previously enforceable, it was discharged in the 2000 Chapter 13 case. Moreover, even if the original Chapter 13 case had never been filed or had not resulted in a discharge, most of the supposed debt had been paid down to an amount no more than approximately $6,000, far less than the transfer amount of $30,000. Therefore, the Court finds that there was no reasonable equivalent value in exchange for the Transfer.

3. Trustee has Failed to Establish Insolvency.

The Court suspects, given the difficulties of the Debtor regarding mortgage deficiency, tax deficiency, credit card debt, and spousal support (though he had not yet filed for divorce on

the date of the Transfer), that he *may* have been insolvent on one of the relevant tests under the statute at the time of the Transfer. However, the Trustee did not present a comprehensive case regarding the value of all assets as well as the full amount of all claims, including the spousal support debts.

Moreover, the Court also observes that this is a case where significant assets were hidden or absconded, including $77,000 in cash that might even still have existed somewhere on the petition date, let alone at the date of the Transfer. The Debtor also has a significant stream of income from veteran's disability benefits and pension and social security. While the Debtor's testimony at trial on the issue of his spousal support was evasive and defensive, and it is clear that the Debtor had not been paying the $2500 per month ordered and had a substantial spousal support judgment entered against him (well after the Transfer), the most plausible interpretation of the testimony at trial is that the $2500 per month owed to Louise included the mortgage payment, as she was to remain in the marital residence, and the Debtor's gross income was approximately $5400 per month.

Insolvency is not presumed in this situation, and it is plausible that the Debtor may not have been insolvent at the time the transfer was made. This is not an excuse of the Debtor's conduct in other ways—but the statute requires the trustee to prove that the debtor incurred debts beyond his *ability* to repay, not beyond his *willingness* to repay. There are other remedies for the latter.

Therefore, because the Trustee has failed to meet his burden in establishing insolvency of the Debtor, the Trustee is unable to prevail on his constructive fraudulent transfer claim.

## C. **State Law Preference Claim.**

1. Legal Framework of Ohio Preference Statute, R.C. 1313.56 and 1313.57.

The Trustee further claims that the Transfer is avoidable under Ohio's preference statute, R.C. 1313.56-1313.59, which the Trustee may invoke by virtue of 11 U.S.C. § 544(b). The operative provision is section R.C. 1313.56, which provides, in full:

> A sale, conveyance, transfer, mortgage, or assignment, made in trust or otherwise by a debtor, and every judgment suffered by him against himself in contemplation of insolvency and with a design to prefer one or more creditors to the exclusion in whole or in part of others, and a sale, conveyance, transfer, mortgage, or assignment made, or judgment procured by him to be rendered, in any manner, with intent to hinder, delay, or defraud creditors, is void as to creditors of such debtor at the suit of any creditor. In a suit brought by a creditor of such debtor for the purpose of declaring such sale void, a receiver may be appointed who shall take charge of all the assets of such debtor, including the property so sold, conveyed, transferred, mortgaged, or assigned, and also administer all the assets of the debtor for the equal benefit of the creditors of the debtor in proportion to the amount of their respective demands, including those which are unmatured.

*Id.* The wording is dense, with a number of conjunctions and disjunctions. However, when broken down, there are two separate, permissible theories of recovery under this Ohio statute. The first allows the trustee to avoid a "sale, conveyance, transfer, mortgage, or assignment, made in trust or otherwise by a debtor, and every judgment suffered by him against himself in contemplation of insolvency and with a design to prefer one or more creditors to the exclusion in whole or in part of others." The second allows the trustee to avoid any similarly defined sale or transfer made "with intent to hinder, delay, or defraud creditors."

Regardless of the specific theory invoked, the advantage of the Ohio statute is that its reach back period is longer than even the one-year period provided under the Bankruptcy Code for preferential transfers to insiders, 11 U.S.C. § 547, or the two-year reach back period for fraudulent transfers under 11 U.S.C. § 548, or even the four-year reach back period for

fraudulent transfers under the Ohio UFTA. *See* R.C. 1336.09. In fact, the Ohio Supreme Court long ago allowed the predecessor statute to R.C. 1313.56 to be invoked to avoid a preferential transfer eight years prior to the date of suit. *See Maas v. Miller*, 51 N.E. 158 (Ohio 1898). The statute has been revised since then, but no statute of limitations has been added and *Maas v. Miller* has never been overruled, though its continued applicability could still be called into question. That argument is not before this Court in this case, however.

On the other hand, regardless of the specific theory invoked, the real limitations of this Ohio statute are the need to prove actual intent (requiring "design" to prefer a creditor, or "intent to hinder, delay, or defraud" other creditors) on the part of the transferor under R.C. 1313.56, *and* knowledge of the same on the part of the transferee pursuant to R.C. 1313.57. "Section 1313.56 of the Revised Code does not apply unless the person to whom such sale, conveyance, transfer, mortgage, or assignment is made, knew of such fraudulent intent on the part of such debtor." *Id*.

In addition, the Ohio Supreme Court, also long ago, in *National Bank of Commerce, et al. v. Gettinger*, 68 Ohio St. 389 (1903), stated that actual cash payments to a creditor were not avoidable under the statute, *id.* at 400, although this rule is arguably an alternative and unnecessary basis for that holding (which also found good faith on the part of the transferee to be a defense even before that was expressly added as a defense in the statute). Conversely, actual cash payments have been avoided under R.C. 1313.56 in federal court without expressly addressing the language of *Gettinger* regarding cash payments. *See, e.g.*, *Conroy v. Schott*, 363 F.2d 90 (6th Cir. 1966) (addressing only *Gettinger*'s language on the transferee's good faith and distinguishing it on that basis).

2. The First Prong of R.C. 1313.56 is Inapplicable Because the Trustee Has Not Shown That Defendant is a Creditor.

The first prong of R.C. 1313.56 specifically requires that the plaintiff prove that the defendant had "a design to prefer one or more *creditors* to the exclusion in whole or in part of others." *Id.* Based on the Court's findings of fact above, the Trustee cannot prevail on this theory because the Trustee has not shown that the Defendant was a creditor of the Debtor, and in fact elicited testimony leading the Court to find the opposite.

3. The Second Prong of R.C. 1313.56 May be Inapplicable and the Court Declines to Reach This Issue.

The Court has already found that the Debtor intended the transfer to hinder, delay, or defraud creditors and that the Defendant was aware of this fact. The circumstantial evidence is overwhelming that the Defendant was aware of the urgency of not only hiding the transferred assets, but also setting up various other assets ultimately for the Debtor's benefit, but either not in his name or without easy tracing to him so as to hinder and defraud his ex-wife, as well as his other creditors.

Therefore, the unresolved issue relevant to the second R.C. 1313.56 theory is whether cash transfers can be avoided under that statute today notwithstanding *Gettinger*—which the Defendant fairly observes, and even the Plaintiff Trustee's attorney conceded in closing, has never been overruled. Because this issue was thinly briefed and was not developed at trial, and because resolving it is not essential to the Court's holding given the Court's conclusion that the Transfer was an actual fraudulent transfer under 11 U.S.C. § 548(a)(1), the Court declines to reach the issue of whether the Trustee could separately avoid the Transfer under R.C. 1313.56-1313.59.

## CONCLUSION

The Trustee has shown that the Debtor's transfer of $30,000 in cash to the Defendant, Debtor's mother, on the eve of the Debtor's divorce, and less than two years prior to the petition date, was made with the actual intent to hinder, delay, and defraud his now ex-wife, and also to hinder, delay, and defraud other creditors who have appeared in this case and whose debts date back to the time of that Transfer. The existence of multiple badges of fraud shifted the burden to the Defendant to explain the legitimate supervening purpose of the Transfer, and no sufficient explanation was offered. The central explanation offered was that it was a payment of an antecedent debt, but the only evidence of that debt offered was insufficient to prove that it ever existed, was sufficient to prove that it would have been discharged more than a decade ago in a prior bankruptcy, and would only have shown a remaining balance of less than $6,000 even if perfectly documented and never discharged.

The Court will enter a separate form of judgment granting judgment in favor of the Plaintiff Trustee consistent with this Memorandum Decision. Judgment in favor of the Plaintiff Trustee Harold A. Corzin in this adversary proceeding will not be deemed entered until the separate form of judgment has been docketed by the Clerk.

# # #